**William H. LEGATE, Claimant, Appellant,**

v.

**J. Joseph MALONEY, Jr., Receiver, Appellee.**

**No. 6287.**

United States Court of Appeals First Circuit.

July 13, 1964.

Mark M. Horblit, Boston, Mass., with whom Samuel H. Kalish and Peter R. Tritsch, Boston, Mass., were on brief, for appellant.

Marcien Jenckes, Boston, Mass., with whom Robert M. Gargill and Charles H. Morin, Boston, Mass., were on brief, for appellee.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

ALDRICH, Circuit Judge.

This is an appeal from a final judgment of the district court, entered under F.R. Civ.P. 54(b) following a memorandum decision, reported in Securities & Exchange Comm. v. duPont, Homsey & Co., 204 F.Supp. 944, and a further opinion and order confirming, except in one respect, a detailed report of a special master. An earlier appeal was ordered dismissed as premature. Legate v. Maloney, 1 Cir., 1962, 308 F.2d 228, cert. den. 372 U.S. 912, 83 S.Ct. 721, 9 L.Ed.2d 720. The questions arise in a receivership proceeding instituted on the complaint of the Securities and Exchange Commission winding up a brokerage firm, duPont, Homsey & Company, of which one Homsey was the managing partner. The firm was a member of the New York Stock Exchange, hereinafter the Exchange. Legate, the appellant, was, for the final year and a half, a limited partner. A retired small businessman, he had previously been a customer of the firm, and continued to be one. In the receivership proceeding appellant sought to rescind his limited-partnership agreement and to make claims as a creditor in lieu thereof, and to establish certain priorities. Alternatively, he claimed items allegedly due him under the agreement. Conversely, the receiver, appellee herein, sought, by way of counterclaim, to recover withdrawals by appellant from his capital account, allegedly in violation of the agreement. Also involved were various claims and cross-claims on appellant's customer's account by, and against, the receiver and for certain other relief. Finally, appellant sought to establish a claim against the Exchange, which the court declined to hear.

We have considered appellant's many contentions, legal as well as factual, but find only three requiring discussion. And with respect to these, since the evidence has not been reported, we must accept the master's findings and conclusions unless inconsistent or plainly wrong in the light of his subsidiary findings.

Our decision as to appellant's claim of rescission could rest upon either of two grounds. In the first place a limited partnership is wholly statutory. Lancaster v. Choate, 1863, 5 Allen (Mass.) 530. Under Massachusetts law it may be doubted whether even a limited partner may assert equitable rights as against innocent creditors. See Mass.G.L. c. 108A §§ 6(2), 39(a) and (b); c. 109 § 29. For the earlier equity rule see, e. g., Richards v. Todd, 1879, 127 Mass. 167; Perry v. Hale, 1887, 143 Mass. 540, 542, 10 N.E. 174; 1 Rowley, Partnership § 39.0, at p. 753 (2d ed. 1960); Lindley, Partnership 599 (11th ed. Salt & Francis 1950); see also Van Andel v. Smith, 10 Cir., 1957, 248 F.2d 915, 918. One of the incidents of a limited partnership, no less than of a general partnership, is that representations as to capital contributions are made to the creditors of the

firm. Cf. Mass.G.L. c. 109 §§ 2, 16, 17 and 23. In the case of Richards v. Todd, supra, on which appellant relies in other particulars, the court carefully restricted the effect of rescission *ab initio* to "as between the parties," and declared that since the defrauded partner "by holding himself out as a member of the firm rendered himself liable to creditors of such apparent firm," he was entitled to an indemnity. Id., 127 Mass. at 173. None of appellant's cases holds to the contrary.

■ However, it is not necessary to reach this broad question. Appellant has not shown as plainly wrong the master's conclusory finding that the conduct of Homsey, "insofar as it is a question of fact, does not afford a basis for rescission." Appellant speaks of misrepresentation and concealment. We recognize no relationship here which would condemn concealment, as such, apart from the extent that such concealment might have made any affirmative representations materially false. Nor are we concerned with cases cited by appellant where a party concealed the fact that he was obtaining a secret advantage, and so could be said to have made an implied misrepresentation.

The affirmative representations found by the master were as follows.

1. That the firm was stable and of good reputation, and its standing "impeccable." The master found that "the partnership was not below standard financially."[1] He also found that the basis for prior criticisms of the firm's failure to meet certain capital requirements of the Exchange had been attended to and cured. To the extent that any greater standing or repute was implied in the above characterizations, or by the word "impeccable," this would seem a typical example of seller's talk or "puffing." Deming v. Darling, 1889, 148 Mass. 504, 20 N.E. 107, 2 L.R.A. 743, cited with approval in Fogarty v. Van Loan, 1962, 344 Mass. 530, 532, 183 N.E. 2d 111; Boston Consol. Gas Co. v. Folsom, 1921, 237 Mass. 565, 130 N.E. 197.

2. That an investment in the firm would be "safe" and "profitable." This is mere classic "prophecy." Lynch v. Pennsylvania R. R., 1947, 320 Mass. 694, 695, 71 N.E.2d 114; Harris v. Delco Products, Inc., 1940, 305 Mass. 362, 25 N.E.2d 740; Fogarty v. Van Loan, supra.

3. That Homsey was "affluent." Whatever this may mean,[2] appellant's evidence to indicate its untruthfulness, that Homsey made expensive personal borrowings from money lenders, established, on the master's findings, nothing which "jeopardize[d] the position of the firm in any way."

4. Finally, the master found that appellant "was impressed by * * * the Exchange's advertising campaign * * * to place faith in the firm" because of its membership. Possibly because the court refused to entertain appellant's attempted claim against the Exchange he failed to introduce evidence of what sort of representations the Exchange made, or, at any rate, failed to bring them to our attention. We cannot, accordingly, consider them for present purposes as having been actionable misrepresentations as distinguished from mere general puffing.

Summarizing, even if appellant's rescission claim is taken at its full value, the only matters that were kept from him related to circumstances which had caused, or in some cases merely had threatened to cause, past violations of certain fiscal requirements of the Exchange. There was no misstatement as to any present violation, or as to existing assets, or, in any substantial matter, as to any firm liability. Nor did these events

---

1. It is true that because of prior infractions of its regulations the Exchange required the firm to maintain a higher margin of credit than usual, a matter Homsey did not disclose to appellant. However, the firm did thereafter conform. Neither the infraction nor the conformance has been shown to have injured the firm.

2. The master did not find, in the words of appellant's brief, that Homsey said he was "a millionaire."

of which appellant complains reflect upon Homsey's morals or ethics. The debacle came from Homsey's launching into a career of manipulation and embezzlement following appellant's entry into the firm, and was not shown to be connected with any prior event. While, conceivably, he might have found the other way, the master's conclusion that appellant was not materially misled was not plainly wrong.

■ However, when we come to a charge on Legate's customer's account (as to one item, only) and the master's handling of the receiver's claim that Legate should be held responsible for Homsey's misconduct because of his failure to disclose Homsey's misdoings before matters reached irremediable proportions, we have difficulties.[3] In November 1959 Homsey purchased 1000 shares of American Motors. The trading slips were all in Homsey's handwriting, but showed Legate as the purchaser. There is no indication that Legate knew anything of this, and the shares were subsequently paid for by the firm. In January 1960 Homsey purchased 2000 shares of Studebaker-Packard. These, too, were paid for by the firm. On February 11 Legate and Homsey went to Florida to visit some friends of Homsey's. Before departing Homsey told Legate that for procedural reasons he had put "a few shares" of American Motors and Studebaker-Packard in Legate's account. Legate protested, saying that he did not want the shares and had no money to pay for them. He was finally prevailed upon to give Homsey two blank checks, with the understanding that the entire transaction was to pass through him simply for the firm's bookkeeping purposes, that the stock was not to belong to him, that his account would be credited with firm money before his checks were negotiated, and that the whole matter would be shortly taken off the books so far as he was concerned. On Legate's return from Florida in April or May he discovered

that the matter had not been taken off the books. On the contrary, his account stood debited as of February 18 with $107,481 as the balance due, over and above the checks, to pay, not for "a few shares," but for the 3,000 shares above stated. The prices charged to him, incidentally, were Homsey's initial purchase prices, and not the substantially reduced value of the stock as of February 18. Legate protested to Homsey, and was told that the matter would be taken care of. At the time he received a statement from the firm's accountants showing these transactions as his. He twice refused to sign an acknowledgment of the correctness of the statement. On the other hand, he did not say why, but kept his own counsel. Nor, apparently, did he again check back to see whether Homsey had righted the matter. In fact, Homsey sold out the stock in June at a "loss" to Legate's account of $17,693.

In spite of having made all of the above specific findings the master concluded, apparently because it was not unusual for Legate to trust Homsey with blank checks, that Legate had "authorized" the personal acquisition of this stock, and so was chargeable with the loss. In our opinion such a conclusion, either by way of authorization or ratification, cannot stand in the light of these subsidiary findings. Legate may have been over-trusting, but as between himself as a customer and the firm he was not a purchaser.

■ Singularly enough, when he came to the receiver's claim against Legate because of his failure to disclose that Homsey was playing fast and loose with his account and so might be doing the same with others, the master proceeded on a quite different basis. If, in fact, Legate had authorized the American Motors and Studebaker-Packard transactions Homsey's maximum misconduct was an over-extension of credit to Legate. The master did not treat Legate's non-communication on this basis. Rather, he

3. The master found against the receiver as to this latter issue, and he has not appealed, but the relevancy of this portion of the case will appear later.

expressly found that Legate "did not report the matter to anyone but Homsey because he felt that Homsey 'would take care of it' and that these securities would be taken off his account." Yet obviously there could be no reason for the shares to be taken off Legate's account if he had authorized the transaction as a purchase rather than as a bookkeeping convenience "to be taken care of" by Homsey.

The master's findings in these two matters are irreconcilable. For the reasons stated an adjustment must be made with respect to the claimed $17,693 loss which the receiver debited against Legate's account.[4]

■ Consideration of appellant's dismissed petition against the Exchange, which asserted misrepresentation, nondisclosure, and failure to live up to its rules and regulations, but for which, allegedly, he would not have been induced to become a member of the firm, requires a further recitation. The Exchange is, and has been at all times presently material, the assignee (by payment) of certain substantial customers' claims against the firm, claims which under no eventuality will be fully satisfied. Indeed, although the receiver exists as a separate party, and will have certain personal claims, the real parties in interest and in competition with each other in the present proceedings are appellant and the Exchange. This fact is not concealed by the circumstance that the Exchange has assigned its interests to an attorney who, it so happens, is representing the receiver on this appeal.[5] As the Exchange's "nominee" or alter ego he filed a claim in the general receivership proceedings, and is and was directly financially interested in various aspects, particularly in the receiver's claim against appellant for failure to disclose Homsey's misdoings. In fact in the Receiver's Counterclaim which he signed as counsel for the receiver it was asserted, *inter alia,* that appellant's non-disclosure was a violation of his "duty to * * * the Exchange." While, perhaps, this allegation was only a makeweight for the receiver's claim on behalf of the creditors as a whole, it is an apt reminder of who those creditors really are.

This is an equitable proceeding. It cannot be that the Exchange can come in as a claimant through a nominee, and through the receiver prosecute claims against appellant for its ultimate benefit, and then say, either as a matter of right or of the district court's discretion,[6] that it is not "here" when appellant wishes to fight back. We see no impropriety in the Exchange being represented by a nominee, as a matter of procedure, even when that nominee acts for the receiver as well, so long as there is no conflict of interest. But the Exchange cannot stick its head in the sand and avoid the normal consequences of its presence. One of those consequences is that it must be here

4. This might, correspondingly, suggest a reopening of the master's finding in Legate's favor with respect to his non-disclosure of Homsey's misconduct. While we do not decide that even though the receiver has not appealed we have no authority to reopen that matter if otherwise there would be an evident miscarriage of justice, this could not be the case here. As we have pointed out, the master's finding against the receiver already assumed that Legate had knowledge of the impropriety of this transaction.

5. It is to be noted that six pages of the "receiver's" brief are devoted to arguing that the petition which appellant sought to have heard against the Exchange was properly dismissed for lack of jurisdiction.

6. The district court appears to have dismissed appellant's petition against the Exchange on both grounds. Seemingly it was misled by the nominee arrangement, for its opinion recites, "The Exchange is asserting no claim against the assets of the receivership," a statement that is echoed in the receiver's brief. It is hard to see how that is so. The fact that, for reasons not worth developing, the Exchange by its nominee became a claimant under circumstances that might entitle it to be termed a Good Samaritan, does not meet the fact that any generosity on its part was not directed towards eliminating claims against appellant. Rather, the Exchange would be the direct beneficiary of those claims.

defensively as well as aggressively. Alexander v. Hillman, 1935, 296 U.S. 222, 241–42, 56 S.Ct. 204, 80 L.Ed. 192. The order dismissing appellant's petition was error.

Judgment will be entered vacating the judgment of the district court and remanding the action for further proceedings not inconsistent herewith.