NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**CLIFFORD A. LOWE, SPOTA LLC, FKA INSITE SOLUTIONS, LLC,**
*Plaintiffs-Appellants*

**v.**

**SHIELDMARK, INC., CROWN EQUIPMENT CORPORATION, ADVANCED PLASTICS, INC.,**
*Defendants-Cross-Appellants*

---

2023-1786, 2023-1871, 2023-1893

---

Appeals from the United States District Court for the Northern District of Ohio in No. 1:19-cv-00748-JG, Judge James S. Gwin.

---

Decided:  March 24, 2025

---

RAY L. WEBER, Renner, Kenner, Greive, Bobak, Taylor & Weber, Akron, OH, argued for plaintiffs-appellants.  Also represented by LAURA J. GENTILCORE.

DAVID J. SHEIKH, Lee Sheikh & Haan LLC, Chicago, IL, argued for defendants-cross-appellants.  Also represented by JAMES F. MCCARTHY, III, HOWARD WERNOW, Sand, Sebolt & Wernow Co., LPA, Canton, OH.

---

Before LOURIE, BRYSON, and REYNA, *Circuit Judges.*

BRYSON, *Circuit Judge.*

This patent case is before us following remand proceedings in the district court. The parties have raised numerous issues on appeal. We affirm the district court's decision on the issues of patent invalidity and false advertising under the Lanham Act, and on most of the procedural issues raised by the parties. We vacate and remand on one of the issues bearing on the sanctions imposed against the plaintiffs.

I

Clifford A. Lowe is the inventor on U.S. Patent No. 10,214,664 ("the '664 patent"), which is directed to floor marking tape of the sort used in industrial facilities. Independent claim 1 of the '664 patent recites:

> 1. A floor marking tape adhered to a floor wherein the floor marking tape establishes a boundary on the floor; the combination comprising:
>
> . . .
>
> The upper surface of each lateral edge portion comprising an extension of the upper surface of the body;
>
> The lower surface of each lateral edge portion being a flat coplanar extension of the lower surface of the body;
>
> The entire body of each lateral edge portion being tapered with the upper surface of the first lateral edge portion extending to the lower surface of the first lateral edge portion and the upper surface of the second lateral edge portion extending to the

> lower surface of the second lateral edge por-
> tion . . . .

'664 patent, col. 5, ll. 2–32.

Independent claim 11 recites:

> 11. A floor marking tape adhered to a floor wherein
> the floor marking tape establishes a boundary on
> the floor; the combination comprising:
>
> . . .
>
> The entire body of each lateral edge portion being
> tapered with the upper surface of the first lateral
> edge portion extending to the lower surface of the
> first lateral edge portion to meet at a first junction
> and the upper surface of the second lateral edge
> portion extending to the lower surface of the second
> lateral edge portion to meet at a second junction;
>
> The first and second junctions disposed on the up-
> permost surface of the floor such that the floor
> marking tape limits unintentional lifting of the
> floor marking tape from the floor . . . .

*Id.* at col. 6, ll. 1–32.

Briefly summarized, the complex procedural history of this case is as follows:

In 2019, Lowe and Spota LLC filed a patent infringe-ment action against the three defendants, which are in-volved in manufacturing, distributing, and selling floor marking tape under the trade name "Mighty Line." Dkt. No. 1 (Original Complaint). The plaintiffs alleged that Lowe was the owner of the '664 patent and that Spota (which at that time was known as InSite Solutions LLC, a North Carolina limited liability company) was the exclu-sive licensee of the patent. Spota later added a claim against ShieldMark, one of the defendants, for false adver-tising in violation of the Lanham Act. The defendants

counterclaimed, alleging that the '664 patent was invalid and was unenforceable due to inequitable conduct.

Based on its claim construction rulings, the district court granted the defendants' motion for summary judgment of non-infringement. On appeal, we vacated the district court's claim construction order and remanded the case for further proceedings. *Lowe v. ShieldMark, Inc.*, No. 2021-2164, 2022 WL 636100 (Fed. Cir. March 4, 2022).

On remand, the district court entered several significant orders. First, in light of intervening events, the court held that neither Lowe nor Spota had standing to sue on the patent. In the alternative, the court held that the asserted claims of the '664 patent were anticipated by a prior art reference, U.S. Patent No. 6,120,395 ("Dorenbusch"). The court also granted the defendants' motion for summary judgment on the plaintiffs' false advertising claim under the Lanham Act.

The court awarded attorney's fees and costs to the defendants under 35 U.S.C. § 285 as well as its inherent power to sanction. The court, however, declined to award fees based on inequitable conduct. The plaintiffs have appealed from the court' dismissal order, and the defendants have appealed from the court's order denying fees for inequitable conduct.

## II

### A

The defendants' standing argument is based on two transactions executed while this case was pending before this court on the plaintiffs' first appeal.

On December 9, 2021, Lowe and Spota executed an agreement referred to as the Patent Rights Assignment, in which Lowe transferred to Spota his "entire right, title and interest" in the '664 patent, including "any cause(s) of

action and damages accruing prior to this assignment." App. 1803.

A week later, on December 16, 2021, Spota and InSite Solutions, LLC, a Delaware limited liability company ("InSite DE") executed a Patent License Agreement ("PLA"). Under the PLA, Spota granted InSite DE a non-exclusive license to practice the '664 patent, as well as the right to sublicense the patent. App. 1809. In addition, Spota granted InSite DE an exclusive option to acquire the '664 patent and agreed not to transfer any ownership right in the patent or any claims of infringement of the patent to any third party. App. 1810.

Section 2.3 of the PLA provided that "Lowe as owner, and [Spota] as exclusive licensee, of the Licensed Patents prior to [December 16, 2021], retain the exclusive rights to elect to maintain, control, and settle the ShieldMark Litigation," and that "Lowe and [Spota] shall bear all costs associated therewith and enjoy any recovery therefrom." *Id*. The clause further provided that "Lowe and [Spota] also retain the exclusive rights to enforce the Licensed Patents for recovery of damages for infringement prior to [December 16, 2021]." *Id*.

B

To establish standing under Article III of the Constitution, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

It is undisputed that Lowe and Spota had Article III standing when they first filed their claim of patent infringement. The question is whether they lost standing to pursue that claim in December 2021 when Lowe assigned his patent rights to Spota and Spota granted a non-exclusive license to InSite DE with the right to sublicense.

"[T]he touchstone of constitutional standing in a patent infringement suit is whether a party can establish that it has an exclusionary right in a patent that, if violated by another, would cause the party holding the exclusionary right to suffer legal injury." *WiAV Sols. LLC v. Motorola, Inc.*, 631 F.3d 1257, 1265 (Fed. Cir. 2010). "A patent owner has exclusionary rights as a baseline matter unless it has transferred all exclusionary rights away." *Intell. Tech LLC v. Zebra Techs. Corp.*, 101 F.4th 807, 816 (Fed. Cir. 2024). A "shared ability to license" does not divest the patent owner of all exclusionary rights. *Id*.

The Article III standing inquiry is distinct from analyzing whether a plaintiff is a "patentee" under 35 U.S.C. § 281 that is entitled to sue for infringement. *See id*. at 814. The term "patentee," as defined in 35 U.S.C. § 100(d), includes not only the patentee to whom the patent was issued but also the successors in title to the patentee. It does not include mere licensees. *Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*, 925 F.3d 1225, 1229 (Fed. Cir. 2019). "[W]hether a party possesses all substantial rights in a patent does not implicate [Article III] standing or subject-matter jurisdiction." *Id*. at 1235–36.

Because Article III standing is a threshold jurisdictional issue, we first address whether Spota has retained an exclusionary right. It is undisputed that Spota currently owns the '664 patent and that InSite DE is a nonexclusive licensee. *See* Blue Br. at 21; Red Br. at 19, 28. Spota did not give InSite DE an "express or implied promise that others shall be excluded from practicing the invention," meaning that Spota remains free to license other parties. *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1552 (Fed. Cir. 1995) (en banc). Contrary to the defendants' argument, Spota's right to license has not been rendered illusory by its agreement not to "assign or transfer to any third party any ownership right or interest" in the '664 patent. *See* App. 1810. A nonexclusive license is not an ownership right, but merely "a promise by the licensor not

to sue the licensee." *Jim Arnold Corp. v. Hydrotech Sys., Inc.*, 109 F.3d 1567, 1577 (Fed. Cir. 1997); *see also Ulead Sys., Inc. v. Lex Comput. & Mgmt. Corp.*, 351 F.3d 1139, 1147 (Fed. Cir. 2003) ("It is well settled that a non-exclusive licensee of a patent has only a personal and not a property interest in the patent.").

Spota has an exclusionary right sufficient to establish Article III standing even if InSite DE has an unrestricted right to sublicense. *See Intell. Tech*, 101 F.4th at 816 ("IT still suffers an injury in fact from infringement even if IT and Main Street can both license the patent."). As stated in Judge Lourie's additional views in *Uniloc USA, Inc. v. Motorola Mobility LLC*, 52 F.4th 1340, 1351 (Fed. Cir. 2022), the fact that a "licensee could preempt . . . a suit by granting a sublicense . . . is a far cry from holding that the patent owner, simply by having granted a non-exclusive license with the right to sublicense, loses the power to sue an unlicensed infringer."

In addition to having Article III standing, Spota, as the assignee of the '664 patent, may sue in its own name. As an initial matter, we reject the defendants' argument that neither Spota nor InSite DE has all substantial rights in the '664 patent and that those rights "are in a state of suspension." Red Br. at 28. Under the facts of this case, if Spota did not transfer all substantial rights to InSite DE, then Spota has necessarily retained those rights. Patent rights do not exist in the ether.

That Spota did not transfer all substantial rights to InSite DE is evident from the fact that InSite DE received only a non-exclusive license. "[A] nonexclusive licensee suffers no legal injury from infringement." *Sicom Sys. Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 976 (Fed. Cir. 2005). The PLA makes clear that InSite DE does not have the right to sue for any infringement that occurred prior to December 16, 2021, and that its right to sue for any infringement occurring after that date is conditioned on its exercise of the

option to acquire the '664 patent. *See* App. 1809–10. Because InSite DE has not yet exercised that option, the fact that it may one day acquire the right to sue is irrelevant for purposes of assessing whether it has all substantial rights as of the present. *See Intell. Tech*, 101 F.4th at 817 ("[I]t is clear that assignment must be evaluated based on the actual transfer of rights, not mere ability" to obtain those rights).

The defendants nevertheless argue that Spota lacks all substantial rights, contending that Spota has only a "hunting license" that "does not equate to a right to enforce." Red Br. at 20. The defendants further argue that any right to enforce the patent is rendered illusory by InSite DE's right to sublicense, citing *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1251 (Fed. Cir. 2000) and *Lone Star*, 925 F.3d at 1231. *Id*.[1]

The defendants' arguments are not persuasive. First, Spota does not have a mere "hunting license," i.e., a contractual arrangement that grants only the right to sue for infringement without any proprietary interest in the

---

[1]    Citing the Asset Purchase Agreement, the defendants argue that Lowe and Spota no longer have the right to practice the '664 patent. Red Br. at 21. Specifically, the defendants assert that Lowe, on behalf of himself and Spota, "agreed that he and his company would not manufacture or sell floor markers or floor tape." *Id*. The defendants, however, made no argument related to the Asset Purchase Agreement before the district court. *See* App. 1786–1801. In any event, the Asset Purchase Agreement simply defines Lowe (not Spota) as a "Restricted Party" and provides that Lowe will not engage or participate in a competing business for a limited number of years. *See* App. 2811–12. A prohibition against practicing the patent in the future does not deprive a party of its right to sue on the patent.

patent. *See Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1381 (Fed. Cir. 2000); *Ortho Pharm. Corp. v. Genetics Inst., Inc.*, 52 F.3d 1026, 1034 (Fed. Cir. 1995). To the contrary, Spota has the "entire right, title and interest" in the '664 patent through the Assignment on December 9, 2021, as acknowledged by the PLA. *See* App. 1811 (Spota's representation that "it is the owner of all right, title and interest in and to the Licensed Patents and has all legal rights necessary to grant the licenses provided for in this Agreement"). Second, neither *Speedplay* nor *Lone Star* suggests that Spota lacks the right to sue because of InSite DE's right to sublicense.

In *Speedplay*, we concluded that all substantial rights had been transferred to an exclusive licensee, which had received the right to enforce the asserted patent as well as the right to sublicense. *See* 211 F.3d at 1250–51. The licensors, however, had retained the right to enforce the patent if the exclusive licensee did not. *Id.* at 1251. Regarding the licensors' right to sue, we held that the right was "illusory, because [the exclusive licensee] can render that right nugatory by granting the alleged infringer a royalty-free sublicense." *Id.* That may also be true of Spota's right to enforce, given InSite DE's unrestricted right to sublicense. However, unlike the licensee in *Speedplay*, InSite DE has only a non-exclusive license and lacks any right to enforce the '664 patent. *Speedplay* therefore does not support finding that Spota has transferred all substantial rights to InSite DE.

In *Lone Star*, the agreement at issue purported to transfer "all right, title and interest" in the asserted patents while imposing several limits on the transferee. 925 F.3d at 1227. The transferee received the right to sue entities specifically listed in the agreement, but the transferor retained the right to sublicense the patents to unlisted entities, among other rights. *Id.* at 1228. In concluding that the transferor retained the right to sue under the patents, we noted that the transferee's enforcement

rights were "illusory, at least in part" because of the transferor's right to sublicense. *Id.* at 1231. However, the transferor in *Lone Star* had rights in addition to the right to sublicense that ensured that it "will always control how the patents are asserted." *Id.* at 1233. InSite DE lacks any such rights.

Accordingly, Spota has Article III standing and remains the "patentee," entitled to sue for infringement.

C

"Generally, one seeking money damages for patent infringement must have held legal title to the patent at the time of the infringement." *Rite-Hite Corp.*, 56 F.3d at 1551; *see also Moore v. Marsh*, 74 U.S. 515, 522 (1868) ("[A] subsequent assignee or grantee can neither maintain an action in his own name, or be joined with the patentee in maintaining it for any infringement of the exclusive right committed before he became interested in the patent."). But "[a] party may sue for past infringement transpiring before it acquired legal title if a written assignment expressly grants the party a right to do so." *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1367 (Fed. Cir. 2010).

Because Lowe owned the '664 patent until December 9, 2021, any infringement of the patent before that date harmed Lowe as the patent owner. *See Crown Die & Tool Co. v. Nye Tool & Mach. Works*, 261 U.S. 24, 41 (1923) ("[T]he injury inflicted by an act of infringement falls upon the individual who owns the monopoly at the date of the infringement."). On December 9, 2021, however, Lowe expressly conveyed to Spota his "entire right, title and interest" in the '664 patent, including "any cause(s) of action and damages accruing prior to this assignment." App. 1803. That express and unambiguous transfer of the right to sue for infringement prior to December 9, 2021, has deprived Lowe of Article III standing in this case.

Before the district court, the plaintiffs sought to overcome the clear implication of the Assignment by arguing that "[w]ith Lowe's assignment of ownership of the '664 patent to [Spota], [Spota] granted Lowe the exclusive right to continue to assert infringement against alleged infringers of the '664 patent during his ownership of the '664 patent, expressly including against ShieldMark." App. 2703. According to the plaintiffs, "[t]he grant of the exclusive right to sue ShieldMark for patent infringement did not have to be in writing because the law does not require licenses to be in writing—only assignments." *Id.* Although the district court agreed that the license agreement did not have to be in writing, the court found that "Lowe has not presented adequate evidence that an exclusive license agreement exists." App. 11.

There is no clear error in that finding of jurisdictional fact. *See Abraxis Bioscience*, 625 F.3d at 1363 ("To the extent any jurisdictional facts are in dispute . . . the findings of fact are reviewed for clear error." (cleaned up)). The record contains no evidence of when the alleged oral agreement took place; there is only attorney argument on appeal that it was "subsequent[]" to the Assignment on December 9, 2021. Blue Br. at 29. Moreover, the only evidence that the plaintiffs point to for both the existence and the substance of the oral agreement is the PLA. In particular, the plaintiffs rely on Section 2.3 of the PLA, which recites that InSite DE "acknowledges and agrees that Lowe as owner, and [Spota] as exclusive licensee, of the Licensed Patents prior to the Effective Date,[2] retain the exclusive rights to elect to maintain, control, and settle the ShieldMark

---

[2]    Section 2.3 does not accurately reflect the dates of the transfer of rights. The Effective Date of the PLA is December 16, 2021. The Assignment, however, was executed on December 9, 2021, so that Lowe was no longer the owner past that date.

Litigation." App. 1810. That statement, however, makes no reference to an oral licensing agreement. If anything, its reference to Lowe as simply the prior "owner" of the patent cuts against the existence of an oral licensing agreement that has changed his status to an exclusive licensee.

Because the district court did not clearly err by finding inadequate evidence of an oral licensing agreement, we need not address whether any agreement that returned Lowe's right to sue for infringement prior to December 9, 2021, would have constituted a mere "hunting license." Lowe lost standing on December 9, 2021, when he transferred his "entire right, title and interest" in the '664 patent, including the right to sue for past infringement during the time he owned the patent.

## III

Because we hold that Spota has Article III standing and qualifies as a "patentee" that may sue in its own name, we turn to the district court's alternative ruling that the '664 patent is anticipated by the Dorenbusch patent.

Claim 1 of Dorenbusch recites:

1. A rearrangeable marking system for temporarily marking a defined area on a hard floor or ground surface without interfering with use of the surface, said rearrangeable marking system comprising a set of individual spot markers with each said individual spot marker made of a synthetic polymeric material, each said individual spot marker further having (i) a substantially flat low profile with a thickness of from about 100 mils to about 300 mils, (ii) peripheral edges beveled downwardly at an about 30 degree to about 60 degree angle to the horizontal, (iii) a non-slip bottom surface for resisting lateral forces, and (iv) a textured top surface, whereby each said individual spot marker when placed on the surface resists lateral forces to

remain in place yet is readily lifted from the surface
for movement to another area or to storage.

App. 66, col. 4 ll. 2–16.

The plaintiffs' argument to the district court that
Dorenbusch does not disclose every limitation of the '664
patent was based solely on two limitations. *See* App. 1042–
43 (the plaintiffs' initial briefing on anticipation), App.
1676–77 (the plaintiffs' post-remand briefing, which is
identical to the initial brief). First, the plaintiffs argued
that Dorenbusch does not disclose that "the upper surface
of each lateral edge portion [comprises] an extension of the
upper surface of the body," as claimed in independent claim
1 (the "extension of the upper surface" limitation). App.
1676. Second, the plaintiffs argued that Dorenbusch does
not disclose that the tape "limits unintentional lifting of the
floor marking tape from the floor," as claimed in independ-
ent claim 11 (the "limits unintentional lifting" limitation).
App. 1677. The plaintiffs made no argument about the "se-
curing" limitation found in claims 1 and 11 or any limita-
tion found in the dependent claims. They have therefore
waived any argument that Dorenbusch does not disclose
those limitations.[3]

---

[3]    The plaintiffs' waiver is clear in light of the 28-page
long chart that the defendants filed as an exhibit to their
brief, which goes through each claim of the '664 patent and
asserts why each limitation is anticipated by Dorenbusch.
*See* App. 1347 ("Exhibit C clearly and convincingly demon-
strates that each and every restriction, element, and limi-
tation of the asserted claims of the '664 patent is present
in the Dorenbusch patent."); Dkt. No. 148-3 (Exhibit C).
The defendants filed their brief a week before the plaintiffs,
but the plaintiffs chose not to address any limitation other
than the "extension of the upper surface" limitation and the
"limits unintentional lifting" limitation.

14                                          LOWE v. SHIELDMARK, INC.

As to the two limitations in dispute, the plaintiffs first argue that Dorenbusch does not disclose the "extension of the upper surface" limitation because "[a]s apparent from the drawing of Fig. 4 of [Dorenbusch] . . . the edges 13 are sharply cut and are separate and distinct from the top surface of the marker, not an extension of the top surface as required by the claims of the '664 patent." Blue Br. at 40. The plaintiffs, however, do not explain the basis for their assertion that "separate and distinct side surfaces" do not constitute an "extension of the top surface."[4]  *Id.*; *see also* Yellow Br. at 20 (arguing that the surfaces of the walls of a room are "clearly not" extensions of the surface of the ceiling and that the four distinct sides of a trapezoid are not "an extension of the other").  At most, the plaintiffs argue that "[a] smooth transition at the edge is required for sliding or dragging pallets, skids, and the like across a factory floor as with the invention of the '664 Patent." Blue Br. at 40–41.

Next, the plaintiffs argue that Dorenbusch does not disclose the "limits unintentional lifting" limitation because the title and abstract of Dorenbusch characterize the spot markers as "temporarily marking a surface" and being "readily lifted from the surface" on which they are placed. *Id.* at 41. The plaintiffs also point out that Dorenbusch uses an adhesive as merely an option and that the Dorenbusch specification states that "[a]n adhesive with a low degree of adhesion is used so as not to unduly make difficult the spot marker's removal from the surface." *Id.* (quoting App. 66, col. 3, ll. 18–20).

We find no error in the district court's grant of summary judgment of anticipation by Dorenbusch.  Based on

---

    4    The parties' joint proposed claim construction to the district court did not include the term "extension." *See* App. 1486–95.

the disputed limitations, no reasonable jury could find that Dorenbusch does not anticipate the '664 patent.

"[A]n independent claim should not be construed as requiring a limitation added by a dependent claim." *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006). We therefore do not read claim 1 of the '664 patent as requiring the "upper surface of the body [to be] smoothly curved between the lateral edge portions" (claim 3) or "the upper surfaces of the lateral edge portions [to be] smoothly tapered" (claim 5). '664 patent, col. 5, ll. 40–41, 46–47. Based on that differentiation, a lateral edge that is an "extension of the upper surface" in claim 1 simply means a lateral edge that is connected to the upper surface. And Dorenbusch recites a spot marker that has "peripheral edges beveled downwardly at an about 30 degree to about 60 degree angle to the horizontal." App. 66, col. 4, ll. 9–11. No reasonable jury could find that those peripheral edges of Dorenbusch are not "an extension of the upper surface" of the spot markers.

Dorenbusch further recites a spot marker that has "a non-slip bottom surface for resisting lateral forces," *id.* at col. 4, ll. 11–12, and the Dorenbusch specification states that the "non-slip bottom surface . . . resists lateral forces to remain in place during use," App. 65, col. 1, ll. 55–57. By its terms, limiting unintentional lifting does not foreclose intentional lifting of the floor marking tape. No reasonable jury could find that Dorenbusch fails to disclose the "limits unintentional lifting" limitation.

Accordingly, the district court did not err in granting summary judgment for the defendants on their counter-claim of patent invalidity.

## IV

The plaintiffs next object to the district court's dismissal of their claim of false advertising under the Lanham Act. The Lanham Act prohibits any person from using in

commerce any "false or misleading description of fact" in commercial advertising or promotion that misrepresents the nature, characteristics, or qualities of that person's goods. 15 U.S.C. § 1125(a)(1)(B). Liability arises under the Lanham Act if the commercial message "is either (1) literally false or (2) literally true or ambiguous but has the tendency to deceive consumers." *Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723, 735 (6th Cir. 2012) (cleaned up). As it did below, Spota argues that ShieldMark's statements regarding is "Mighty Line" tape were literally false.

"Only an unambiguous message can be literally false." *Id.* at 737 (cleaned up). "[R]easonable consumers know that marketing involves some level of exaggeration—what the law calls 'puffery.'" *Wysong Corp. v. APN, Inc.* (17-1975), 889 F.3d 267, 271 (6th Cir. 2018). "Courts thus view Lanham Act claims challenging hyperbolic advertising with a skeptical eye." *Id.*; *see also Interactive Prods. Corp. v. a2z Mobile Off. Sols., Inc.*, 326 F.3d 687, 699 (6th Cir. 2003) ("[M]ere puffery . . . is not actionable under the Lanham Act.").

The three advertising statements at issue in this case are: (1) Mighty Line Floor Tape's "[b]eveled edge tape can take a beating from industrial wheel traffic"; (2) "Mighty Line Floor Tape withstands industrial brush scrubbers, forklifts, and heavy industrial wheel traffic"; and (3) Mighty Line Floor Tape's "[b]eveled edges increase durability for forklift traffic." App. 26–27.

Spota argues that those statements are literally false because ShieldMark "necessarily admitted . . . its product unintentionally lifts from the floor." Blue Br. at 44. That is, Spota points out that ShieldMark asserted non-infringement on the basis that the Mighty Line tape does not satisfy the claim limitation requiring that the product "limits unintentional lifting of the floor marking tape from the floor." *Id.* Spota also points out that ShieldMark argued that the Mighty Line tape was no different from its

previous product, DuraStripe, and that DuraStripe had a disclaimer that it was "not warranted against damage caused by items pushed or dragged across the product, such as skids or pallets." *Id.* at 45.

Even assuming that the Mighty Line floor tape can be unintentionally lifted from the floor, no reasonable jury could find that statements about "increase[d] durability" or "withstand[ing]" or "tak[ing] a beating" from industrial wheel traffic were unambiguously false.[5]   Each of those terms accommodates variations in degrees.  As the district court put it, "Defendant's statements make no measurable promises other than that Mighty Line Floor Tape probably falls somewhere between tape that disintegrates at the lightest touch and tape strong enough to survive a nuclear bomb." App. 28.  Moreover, "[t]hose terms can just as easily refer to a tape's ability to resist abrasion, discoloration, or deformation when forklifts and other machines pass over it." *Id.*

---

[5]   Spota suggests in its reply brief that those statements are literally false because the Mighty Line tape does not even have "beveled edges" to begin with.  *See* Yellow Br. at 25.  But that argument is waived.  In addition to being raised it only in the reply brief, Spota asserted below that "Plaintiffs have never alleged that the accused tape does not have 'beveled edges'; rather, Plaintiffs have always alleged the accused tape does not have the claimed edges." App. 2096.

Spota also makes an argument based on *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 586 (3d Cir. 2002), for the first time in the reply brief.  Because that argument was not raised in Spota's opening brief, it has been waived.

The district court did not err in granting summary judgment on Spota's false advertising claim.

V

Following the 2022 remand to the district court, Lowe and Spota filed a motion to recuse or disqualify Judge Gwin. App. 1238. The court denied the motion, and the plaintiffs have appealed.

The Sixth Circuit "reviews decisions denying . . . motions to recuse under the abuse of discretion standard." *Youn v. Track*, 324 F.3d 409, 422 (6th Cir. 2003) (cleaned up). The court "must have a definite and firm conviction that the trial court committed a clear error of judgment before reversing under the abuse of discretion standard." *Id.* (cleaned up).

In *Liteky v. United States*, 510 U.S. 540 (1994), the Supreme Court set out the pertinent principles that apply to judicial recusal. "First, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion," and "[a]lmost invariably, they are proper grounds for appeal, not for recusal." *Id.* at 555. "Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.* "Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Id.*

The facts alleged in Lowe's affidavit (as well as in the affidavits of plaintiffs' counsel, Ray L. Weber and Laura J. Gentilcore) focus on various statements the court made in proceedings, in addition to orders the court entered regarding scheduling, supplemental briefing, and the substitution of an expert witness. *See* App. 1254–65, 2714–20.

LOWE v. SHIELDMARK, INC.                                    19

Those facts fail to support a "definite and firm conviction that the trial court committed a clear error of judgment." *Youn*, 324 F.3d at 422. Accordingly, there was no abuse of discretion in the district court's denial of the plaintiffs' recusal motion.

## VI

### A

The district court awarded the defendants fees and costs incurred in litigating the plaintiffs' patent infringement claim from December 2021 onwards, in the amount of $213,765.[6] App. 43. The district court cited both 35 U.S.C. § 285 and its inherent power to sanction as independent grounds for the award. *See id.* at 37–39. We affirm the award under the district court's inherent power to sanction, which we review for an abuse of discretion. *Youn*, 324 F.3d at 420. It is therefore unnecessary to address the parties' arguments regarding section 285.

A district court has inherent power to "assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991) (cleaned up). The court may assess attorney's fees against a party that "shows bad faith by delaying or disrupting the litigation." *Id.* at 46. "The imposition of inherent power sanctions requires a finding of bad faith, or conduct tantamount to bad faith." *Youn*, 324 F.3d at 420 (cleaned up).

---

[6] Although the district court awarded fees and costs beginning in December 2021, the defendants submitted fee tables only from May 2022 because the case was inactive at the district court level until April 2022, when we remanded the case from the first appeal. App. 41 n.46. The district court accepted the defendants' fee calculation.

The district court found that the plaintiffs' actions from December 2021 onwards "strongly support an inference of bad faith." App. 38. Specifically, the court found that early on in discovery, the defendants had "requested production of any documents relating to ownership and licensing of the '664 patent" and that the only response the plaintiffs made in July 2019 was that there were "no responsive documents." App. 37. The district court further found that by December 16, 2021, after both the Assignment and the PLA were executed, the plaintiffs knew that they now had documents responsive to the request and that they had a duty to supplement their discovery responses under Federal Rule of Civil Procedure 26(e)(1)(A). *Id.* The district court found that, despite such knowledge, "Plaintiffs (1) took no initiative to supplement their productions; (2) refused to produce the ownership and license documents when confronted by Defendants; and (3) filed a Fourth Amended Complaint in which Plaintiffs explicitly misrepresented to Defendants and to this Court the status of the patent." *Id.*

The plaintiffs argue that they did not "hide" the change in ownership since a copy of the Assignment was publicly available. Blue Br. at 55. The plaintiffs also argue that the Assignment and the PLA had "no impact" on Lowe or Spota's "Article III or prudential standing," suggesting that the non-disclosure of those documents was therefore harmless or not in bad faith. *Id.* Finally, the plaintiffs point to the fact that they produced the PLA to the defendants in July 2022, "within 14 days after the issue was first raised by Defendants." *Id.* at 56. The plaintiffs, however, do not dispute that they did not take the initiative to supplement their discovery responses, nor do they deny that they misrepresented the state of ownership in the Fourth Amended Complaint, which was filed nearly six months after the transactions in December 2021, and in which the plaintiffs identified Lowe as the patent owner and Spota as the exclusive licensee.

In their reply brief, the plaintiffs assert that they admitted in the district court that they had mischaracterized the status of Lowe and Spota in their Fourth Amended Complaint. Yellow Br. at 36. They also assert that discovery "was over before the transfer" and that after remand, they were "not looking at supplementation" because "they were knee-deep in addressing allegations of invalidity, as the district court directed briefing on the issue." *Id.* at 36–37.

Factual findings underlying sanctions based on the district court's inherent powers are reviewed for clear error. *Youn,* 324 F.3d at 420. Applying that standard, we defer to the district court's implied finding that the plaintiffs' misrepresentation in the Fourth Amended Complaint was not merely an honest mistake. Moreover, the duty to supplement discovery responses under Rule 26(e) continues even after the discovery period has closed. *See L.A. Terminals, Inc. v. United Nat'l Ins. Co.*, 340 F.R.D. 390, 396 (C.D. Cal. 2022) (collecting cases).

We discern no clear error in the district court's finding of bad faith conduct by the plaintiffs that prejudiced the defendants. Lowe lost Article III standing after the Assignment, and the plaintiffs' conduct delayed litigation with respect to Lowe's patent infringement claim. We therefore affirm the district court's award under its inherent power to sanction.

B

The district court also invoked its inherent power to sanction in awarding the defendants fees and costs they incurred when they moved to seal an expert report that the plaintiffs filed. App. 39.[7] Local Patent Rule 2.2 for the

---

[7]    The district court held that although Federal Rule of Civil Procedure 37(b) ordinarily governs discovery sanctions, the rule "does not appear to encompass sanctions for

Northern District of Ohio provides that "[p]ending entry of a protective order, discovery and disclosures deemed confidential by a party shall be produced to the adverse party for the eyes of outside counsel of record only, marked 'Attorney's Eyes Only Subject to Protective Order[]'. . . and shall not be disclosed to the client or any other person." The district court found that the plaintiffs violated that rule by filing on the court's public docket an expert report that "disclosed information Defendants had marked as Attorney's Eyes Only." *Id*. at 40. At the time of the filing, no protective order had been entered by the court.

The district court, however, made no finding that the plaintiffs acted in bad faith when filing that expert report. *See id*. at 39–40. Nor did the district court make a finding that Spota and Lowe's conduct was tantamount to bad faith. *Id*. Because the district court did not make the necessary findings to invoke its inherent power to sanction, *see Youn*, 324 F.3d at 420, we vacate the district court's award of $4,750 for fees and costs arising from the plaintiffs' violation of Local Patent Rule 2.2 and remand for the required findings.

## VII

The defendants also sought fees for Lowe's inequitable conduct before the PTO, pointing to a photograph that Lowe submitted during the prosecution of the '664 patent. The photograph shows two floor tapes side by side with no other information than the statement that one was on sale prior to 2004 and the other on sale in 2018. *See* App. 1988. The defendants assert that Lowe was not forthcoming about the prior-art DuraStripe tape and submitted the

---

violations of local discovery rules." App. 39. The court thus relied on its inherent power to sanction, which exists to "fill in the interstices" not covered by sanction statutes and rules. *Id*. at 39–40 (quoting *Chambers*, 501 U.S. at 46).

photograph of DuraStripe floor tape "without identifying it as the prior-art DuraStripe floor tape with 'unique beveled edges' that Lowe had advertised, distributed, and sold through Insite Solutions more than one year before the . . . priority date of the '664 Patent." Gray Br. at 4–5.

"Inequitable conduct includes affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." *Bd. of Educ. Ex rel. Bd. of Trs. of Fla. State Univ. v. Am. Bioscience, Inc.*, 333 F.3d 1330, 1343 (Fed. Cir. 2003). We review for clear error the district court's determination of "whether the conduct meets a threshold level of materiality" and "whether the evidence shows a threshold level of intent to mislead the PTO." *Id.*; *see also Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1365 (Fed. Cir. 2008) (holding that the accused infringer must prove both materiality and intent to deceive by clear and convincing evidence). It is only after the threshold levels of materiality and intent have been established that the district court is required to weigh them and "determine whether the applicant's conduct is so culpable that the patent should be held unenforceable." *Am. Bioscience*, 333 F.3d at 1343. "We review the district court's ultimate determination of inequitable conduct under an abuse of discretion standard." *Id.*

The district court found that "Lowe did not hide the existence of DuraStripe or the possibility of prior art entirely" and that "[b]ecause there was some limited effort to disclose, Defendants have not established by clear and convincing evidence that Lowe intended to and did withhold material information." App. 36. We find no clear error to those threshold determinations made by the district court, even considering the defendants' expert report and the defendants' argument on the difference that further information would have been material to the prosecution. We therefore affirm the district court's finding on inequitable conduct.

Each party shall bear its own costs for this appeal.

**AFFIRMED IN PART, VACATED AND REMANDED IN PART**